**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**GOLD COAST COMMODITIES, INC.**                                      **PLAINTIFF**

**vs.**                                    **CIVIL ACTION No.: 3:18-CV-793-HTW-LGI**

**CRUM & FORSTER SPECIALTY**
**INSURANCE COMPANY**                                              **DEFENDANT**

## OPINION AND ORDER

BEFORE THIS COURT are the following motions: Motion for Partial Judgment on the

Pleadings **[Docket no. 16],** filed by the plaintiff; and Motion to Dismiss **[Docket no. 18],** filed by

the defendant. The motions are in direct opposition to each other and the arguments are interrelated

such that this court will address both in this memorandum opinion and order.

### I.      PROCEDURAL HISTORY

The plaintiff, Gold Coast Commodities, Inc. (hereinafter referred to as "Gold Coast") filed

its lawsuit in this federal forum on November 14, 2018. Gold Coast's complaint alleges the

following causes of action: breach of contract; declaratory relief; and insurance contract

reformation.

Gold Coast filed its lawsuit in this federal forum invoking 28 U.S.C. § 1332's[1] complete

diversity of citizenship subject matter jurisdiction. According to Gold Coast, it is a State of

Mississippi Corporation whose principle place of business is Rankin County, Mississippi. The

defendant, Crum & Foster Specialty Insurance Company (hereinafter referred to as "Crum") is a

State of Delaware Corporation duly licensed to do business in the State of Mississippi. Gold Coast

---

[1] (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the
sum or value of $75,000, exclusive of interest and costs, and is between—

　　　　(1) citizens of different States;

28 U.S.C.A. § 1332 (West).

does not allege where Crum's principle place of business is, other than to say: "in a state other than Mississippi." Gold Coast further alleges that the amount in controversy is greater than $75,000.00, the statutory minimum for diversity of citizenship jurisdiction.

Crum has not challenged Gold Coast's assertion of complete diversity of citizenship subject matter jurisdiction; nevertheless, this court has an independent obligation to verify it possesses subject matter jurisdiction.[2] Upon a review of the pleadings of the parties, this court finds it possesses subject matter diversity jurisdiction.

Gold Coast served Crum with summons and the complaint on November 15, 2018. Crum filed its answer on December 6, 2018, raising as a defense that the complaint has failed "to state a claim upon which relief can be granted."

## II.    FACTUAL BASIS

As stated above, Gold Coast is a corporation registered in the State of Mississippi and it has been in business since at least 1983. Gold Coast operates a business in Rankin County, Mississippi, which produces customized animal feed products using acidulated[3] oil seed soapstocks[4], Used Cooking Oil ("UCO"), poultry fat, palm fatty acids and oils. Part of its production process requires the addition of sulfuric acid to used oil and soapstock. Effluent[5] from

---

[2] Federal courts are obliged to examine the basis for the exercise of federal subject-matter jurisdiction. *Smith v. Texas Children's Hospital*, 172 F.3d 923, 925 (5th Cir. 1999). A federal district court may examine its subject-matter jurisdiction over a matter, *sua sponte*, at any time. *Giles v. Nylcare Health Plans, Inc.*, 172 F.3d 332, 336 (5th Cir. 1999) (a court must raise the issue *sua sponte* if it discovers that it lacks subject matter jurisdiction); 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (3d ed. 2007). Under Rule 12(h)(3) of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." (emphasis added)

*Dean v. Mozingo*, 521 F. Supp. 2d 541, 551 (S.D. Miss. 2007)(overturned on other grounds).

[3] **acidulated** adj. Made slightly acidic or sour; flavoured with acid.

Oxford English Dictionary.

[4] **soapstock** n. (also soap-stock) a crude, partially saponified mixture of fatty acids formed as a by-product in the refining of natural fats.

Oxford English Dictionary.

[5] **effluent** n. waste discharged from an industrial works.

this process is mixed with sodium hydroxide (also known as lye) or some other caustic material before disposal. The highly acidic effluent must be kept at extremely high temperatures; otherwise, it would not flow during disposal. This process allegedly produces at least 6,000 gallons of wastewater per week.

Gold Coast purchased a pollution liability policy (hereinafter referred to as the "Policy") from Crum to protect against lawsuits and other claims alleging injury from supposed pollution caused by Gold Coast. The Policy became effective August 25, 2016,  and ran through August 25, 2017.

The Policy provides one or more insurance coverage parts that have been purchased by Gold Coast. According to Gold Coast, the Policy contains two (2) provisions that are relevant to the lawsuit *sub judice*: The Third-Party Pollution Liability Coverage Part (hereinafter referred to as "Third-Party Part"); and the Contractors Pollution Liability Coverage Part (hereinafter referred to as "Contractors Part"). The court addresses these parts in great detail, *infra*.

The Policy further states that "various provisions in this Policy restrict coverage." [Docket no. 101 at p. 12]. These provisions restricting coverage are referred to as "exclusions". The Policy lists thirteen "common exclusions", for which the Policy does not provide coverage. For purposes of the lawsuit *sub judice*, the following exceptions are raised by the parties: "any damages", "defense expenses", "cleanup costs", or any loss, cost or expense, or any "claim or suit based upon or arising out of any criminal fraudulent or dishonest act, omission committed by the insured"; and "for punitive damages or the multiplied portion of treble or other multiplied damages, or that arise out of that portion of any "claim" or "suit" seeking or awarding punitive damages or the multiplied portion of treble or other multiplied damages." [Docket no. 1-1, pp. 21, 24].

---

Oxford English Dictionary.

In 2014 Gold Coast entered into an agreement with the City of Pelahatchie, Mississippi (hereinafter referred to as "Pelahatchie") to dispose of Gold Coast's wastewater to Pelahatchie's sewage treatment facility once or twice a week. In the first ten (10) months of 2016, Gold Coast allegedly only transported its wastewater to Pelahatchie for disposal two (2) times.

On October 6, 2016, the City of Brandon, Mississippi (hereinafter referred to as "Brandon") filed a complaint with the Mississippi Department of Environmental Quality (hereinafter referred to as "MDEQ") alleging that Gold Coast was illegally discharging oily, acidic wastewater into Brandon's sewer system. MDEQ began an investigation which was inconclusive, but did find several potential MDEQ violations; namely, failure to train and failure to conduct "jar tests[6]". Shortly following MDEQ's first investigation, Gold Coast allegedly began regularly to transport its wastewater to Pelahatchie.

MDEQ conducted a second investigation of Gold Coast's facilities on October 11, 2016., Thomas Douglas (hereinafter referred to as "Douglas"), who is an officer of Gold Coast, claimed that Gold Coast did not dispose of most of its wastewater because it used the wastewater to adjust the fat content of its products. Douglas also supposedly admitted that Gold Coast did not record the pH levels, amount, date, and time of its wastewater disposal at Pelahatchie.

Around the same time, October 2016, Brandon began its own investigation of Gold Coast's operations. Allegedly, the Brandon investigation revealed significant amounts of high-temperature, acidic wastewater in its sewer system that originated at the Gold Coast point of discharge and downstream from such. On November 4, 2016, Brandon informed Gold Coast that it was going to install a monitor at Gold Coast's point of discharge station.

---

[6] MDEQ's Memorandum of Laura James, ECED [Docket no. 1-3] states the following: "[J]ar tests were never mentioned. I asked [the plant manager] if he had ever conducted a jar test. He stated he had not…I told him the failure to conduct jar tests and lack of training would likely result in a Notice of Violation…" The parties herein do not expound upon the term "jar test").

Gold Coast, according to Brandon, then began illegally to transport its wastewater to the City of Jackson, Mississippi (hereinafter referred to as "Jackson")illegally to dispose of the waste water in Jackson's sewer system. MDEQ issued a report of its investigation finding that Gold Coast was illegally discharging its wastewater into Jackson's sewer system.

Brandon continued its investigation in February, 2017, to determine what damage had been done to its sewer system by the high-temperature, acidic wastewater that Gold Coast had allegedly disposed of in Brandon's sewers.

On or about April 12, 2017, Gold Coast provided written notice of a potential claim to Crum. Crum, thereafter, refused to renew the Policy.

On July 10, 2018, Brandon filed the underlying lawsuit (hereinafter referred to as the "Brandon Lawsuit"). The Brandon Lawsuit's preamble states that it seeks to recover "for money damages caused to [Brandon's] property by [Gold Coast's] consistent willful, wanton, reckless and/or negligent acts…." The Brandon Lawsuit complaint alleges that these pollution discharges occurred at and over various periods of time, including "in the first ten (10) months of 2016"—a period which would include four months of the Policy period. Count I of the Brandon Lawsuit alleges "Negligence." Counts I and II both allege that various acts of [Gold Coast] were "reckless", "wanton", and "intentional." Count III alleges Negligence Per Se. County IV of the Brandon Lawsuit alleges that Gold Coast violated certain municipal ordinances.

Crum allegedly acknowledged that the Brandon Lawsuit fell under the Policy's "prior notice provision"—then denied coverage on the basis that the Brandon Lawsuit was filed after the Policy period had ended. Crum also denied coverage under the Policy, stating that the Brandon Lawsuit alleged only intentional, knowing conduct.

### III.   ANALYSIS

*a.  Motion for Partial Judgment on the Pleadings*

A motion for judgment on the pleadings "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract Co. v. Touchstone Props., Ltd.,* 914 F.2d 74, 76 (5th Cir.1990) (*per curiam*) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1367, at 509–10 (1990)). In analyzing the complaint, this court must accept "all well-pleaded facts as true, viewing them in the light most favorable to the [non-movant]." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co*., 313 F.3d 305, 312-13 (5th Cir. 2002) (citing *Doe v. Hillsboro Indep. Sch. Dist.,* 81 F.3d 1395, 1401 (5th Cir.1996)). This court should "not, however, accept as true conclusory allegations or unwarranted deductions of fact." *Id*. Documents attached to a Complaint are considered part of the pleadings; accordingly, this court must consider the contents of such documents when deciding a motion for judgment on the pleadings. *Voest–Alpine Trading USA Corp. v. Bank of China,* 142 F.3d 887, 891 n. 4 (5th Cir.1998)).

This lawsuit involves an insurance coverage dispute, so this court must look to Mississippi law "for rules governing contract interpretation." *ACS Const. Co., Inc. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003). "Under Mississippi law, an insurance policy is a contract subject to the general rules of contract interpretation." *Id., citing Clark v. State Farm Mut. Auto. Ins. Co.*, 725 So.2d 779, 781 (Miss.1998). This court must review the insurance policy and, where unambiguous, enforce such policy according to its terms. *Id*. If this court determines that the contract presents any ambiguity, it "must necessarily find in favor of coverage" for the insured. *Id., citing J&W Foods Corp. v. State Farm Mutual Automobile Ins. Co.,* 723 So.2d 550, 552 (Miss.1998).

The determination of whether a duty to defend exists is made from the face of the complaint in the Brandon Lawsuit. *American Guarantee and Liability Ins. Co. v. The 1906 Co.*, 273 F.3d 605, 610 (5th Cir. 2001). Whether an insurer has a duty to defend depends on a comparison of the policy's terms with the allegations in the underlying complaint, even if the assertions may be groundless, false, or fraudulent. *Minnesota Life Ins. Co. v. Columbia Cas. Co.*, 164 So. 3d 954, 970 (Miss. 2014); *State Farm Mut. Auto. Ins. Co. v. Taylor*, 233 So. 2d 805, 808 (Miss. 1970). An insurer has no duty to defend those claims that fall outside of the policy's coverage. *Farmland Mut. Ins. Co. v. Scruggs*, 886 So. 2d 714, 719 (Miss. 2004).

> "Mississippi has adopted the 'allegations of the complaint' rule (sometimes referred to as the eight-corners test) to determine whether an insurer has a duty to defend," pursuant to which the court reviews the allegations in the underlying complaint to see whether it states a claim that is within or arguably within the scope of the coverage provided by the insurance policy. *Ingalls Shipbuilding v. Federal Ins. Co.*, 410 F.3d 214, 225 (5th Cir.2005). In so doing, the court compares the words of the complaint with the words of the policy, looking "not to the particular legal theories" pursued by the plaintiffs, "but to the allegedly tortious conduct underlying" the suit. *Id.* (citations omitted). *See also United States Fidelity & Guarn. Co. v. Omnibank*, 812 So.2d 196, 200 (Miss.2002). If the complaint alleges facts which are arguably within the policy's coverage, a duty to defend arises.

*Acceptance Ins. Co. v. Powe Timber Co.*, 403 F. Supp. 2d 552, 554 (S.D. Miss. 2005), aff'd, 219 F. App'x 349 (5th Cir. 2007).

As stated supra, the two (2) policy provisions applicable to this lawsuit are the Third-Party Pollution Liability Coverage Part ("Third-Party Part"); and the Contractors Pollution Liability Coverage Part "Contractors Part"). Both provisions rely upon an interpretation of the term "occurrence" as defined by the Policy: "26. 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

### i.  Third-Party Pollution Liability Coverage ("Third-Party Part")

The Third-Party Part covers "property damage" and "cleanup costs" "…resulting from a 'pollution condition' that was caused by an 'occurrence'" if each of several listed conditions applies. The Policy defines a "pollution condition" to "mean [] the discharge, dispersal, seepage, migration, release, escape, presence or movement of pollutants." An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." This court finds it instructive to quote the language of the contract in full here:

> 1. Third Party Pollution Liability
>
>> a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:
>>
>>> (1) As "damages" because of "bodily injury" or "property damage", and
>>>
>>> (2) For "cleanup costs";
>>>
>>>> resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies. We may, at our discretion, investigate any "occurrence" or "pollution condition" incident and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section IV - Limits of Insurance And Deductible within the Common Provisions.

The Brandon Lawsuit "seeks to recover "for money damages caused to City property" resulting from Gold Coast's act of allegedly "dumping commercial wastes into the City's wastewater system" along with "damages…commensurate with the physical damage done to City property by Gold Coast's actions…."

Crum states that to determine whether the policy covers an "occurrence," the only relevant consideration is whether, according to the allegations in the underlying pleadings, "the chain of events leading to the injuries complained of were set in motion, and followed a course consciously devised and controlled by the insured without the unexpected intervention of any third person or extrinsic force." *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So. 3d 1148, 1153-54 (Miss. 2010).

The insured must have acted accidentally and/or unintentionally to implicate policy coverage. *Id*. According to Crum, Brandon alleged that Gold Coast acted either grossly negligently or intentionally. Thus, says Crum, the Brandon Lawsuit asserts causes of action that are not covered by the Policy because Gold Coasts' alleged actions are not defined as "occurrences" under the Policy.

Gold Coast argues that the Brandon Lawsuit alleges that the damages to the City were covered under the Policy's definition of "occurrence" and that some of the alleged actions occurred during the covered period – 2016. Gold Coast further concedes that some of the damages that Brandon alleged against Gold Coast in the Brandon Lawsuit are outside of the Policy coverage. According to Gold Coast, however, if *any* claim in the Brandon Lawsuit "is within or arguably within the scope of coverage provided by the policy," Crum is obligated to defend Gold Coast against the allegations of the Brandon Lawsuit. *American Guarantee and Liability Ins. Co*., 273 F.3d at 610.

Gold Coast directs this court to the following allegations in the Brandon Lawsuit to support its position: (1) that Gold Coast simply "discharge[d]" wastewater into the sewer system at some unknown point "in the first ten (10) months of 2016." [Docket no. 1-3, p. 3]; (2) Gold Coast employees and officers" told state investigators in October, 2016, that "they did not know how the low-pH wastewater got into City sewers." *Id*. These allegations, according to Gold Coast, are ambiguous as to when "the chain of events leading to the injuries complained of were set in motion". *Architex Ass'n, Inc.* 27 So. 3d at 1153-54.

Gold Coast further argues that the Brandon Lawsuit failed to allege any facts regarding "how much of any material Gold Coast allegedly discharged at any particular point in time; how any such discharge allegedly occurred; when any such discharge allegedly occurred; when any

damage to the city sewer system actually occurred; etc." [Docket no.27, p. 2]  The lack of these allegations, says Gold Coast, presents ambiguities as to whether there existed "a course consciously devised and controlled by the insured without the unexpected intervention of any third person or extrinsic force." *Architex Ass'n, Inc.* 27 So. 3d at 1153-54.

This court finds that Brandon's causes of action against Gold Coast in the Brandon Lawsuit allege both reckless and intentional conduct, no matter the legal labels Brandon has attached to such claims. Brandon specifically alleges the following: that Gold Coast "consistently and surreptitiously discharged its high-temperature, corrosive waste into the City' sewer system for an unknowing number of years leading up to 2014 [Docket no. 1-3, p. 9]; that despite notice of violations, Gold Coast "continued dumping its prohibited wastewater in the City sewer system…in violation of federal, state, and municipal regulations and laws [Docket no. 1-3, p. 17]; and that Gold Coast, being highly knowledgeable about the chemicals used and disposed of in its business of producing customized animal feed products, knew or should have known that "discharging ithe high-temperature, acidic effluent from its business operations would damage the City sewer system." [Docket no. 1-3, p. 22].

The overarching theme of the Brandon Lawsuit, then, is that Gold Coast allegedly deliberately dumped highly corrosive, high temperature wastewater directly into the Brandon sewer system in violation of various ordinances and statutes. An in-depth reading of the Brandon Lawsuit complaint reveals that Brandon believes that after it had confronted Gold Coast in October 2016, warning Gold Coast that Brandon intended to install a monitor at Gold Coast's discharge location, Gold Coast continued its illicit activity while trying to conceal said activity by secretly disposing of Gold Coast's wastewater in Jackson's sewer system "without proper treatment,

thereby continuing to subvert applicable public-health and environmental laws." [Docket no 1-3, p. 5].

Brandon's Complaint is replete with references to: "willful", "reckless", "wanton"; "constantly and surreptitiously discharged"; "known or should have known it was not safe to discharge"; "continued to illegally discharge"; admitted it "had not been recording the pH, amount, date and time of wastewater disposed despite its contract with Pelahatchie"; "Gold Coast's determination to discharge its wastewater into public sewers despite clear knowledge it was unsafe and illegal to do so…"

Although the Brandon Complaint provides a count on Negligence, this heading is no solace for Gold Coast. First, as instructed by *Acceptance Ins. Co.*, 403 F. Supp. 2d at 554:

> ..[T]he court compares the words of the complaint with the words of the policy, looking "not to the particular legal theories" provided by the plaintiffs, "but to the allegedly tortious conduct underlying the suit.

Even in this Negligence section, the Brandon Complaint accuses Gold Coast of knowing, or that Gold Coast should have known, its wrongful conduct was "highly foreseeable", intentional, reckless and wanton, causing Gold Coast to violate several municipal ordinances.

These tortious actions, accuses Brandon, expose officers of Gold Coast to liability, because they "directly participated in, authorized, had knowledge of and/or gave their consent to the commission of the torts described in the Brandon Complaint."

The Brandon Complaint does not provide charging words amounting to an accident/occurrence. Accordingly, in this court's eye, the Brandon Lawsuit alleges both reckless and intentional conduct against Gold Coast, sufficient to preclude coverage under the Policy. This court, therefore, denies, as it must, Gold Coast's Motion for Partial Judgment on the Pleadings.

ii.  Contractors Part

The Contractors Coverage also covers "property damage" and "cleanup costs" "resulting from a pollution condition that was caused by an occurrence" if several listed conditions (which differ from those applicable to the Third-Party Coverage) are met. This court again finds it instructive to quote the language of the contract in full here:

1. Contractors Pollution Liability

a. We will pay, in excess of the Deductible shown in the Declarations, those sums the insured becomes legally obligated to pay:

(1) As "damages" for "bodily injury" or "property damage"; and

(2) For "cleanup costs";

resulting from a "pollution condition" that was caused by an "occurrence" and to which this insurance applies. We may, at our discretion, investigate any "occurrence" or "pollution condition" and settle any "claim" or "suit" that may result. But the amount we will pay is limited as described in Section IV - Limits Of Insurance And Deductible within the Common Provisions.

This court finds, for the same reasons stated *supra* in Section III.a.i., that the Policy provides that Crum has no duty to defend Gold Coast based upon this ground.

b.  ***Crum's Motion to Dismiss***

This court now turns to Crum's Motion to Dismiss [Docket no.19].  Crum filed it is Motion under the auspices of Federal Rule of Civil Procedure 12(b)(6)[7], asking this court to dismiss the complaint *sub judice* for various reasons, listed *infra*. Gold Coast opposes all such reasons.

---

[7] b) **How to Present Defenses.** Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:
***(1) lack of subject matter jurisdiction;***
(2) lack of personal jurisdiction;
(3) improper venue;
(4) insufficient process;
(5) insufficient service of process.
***(6) failure to state a claim upon which relief can be granted; and***
(7) failure to join a party under Rule 19. . . .

i.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows this court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). The "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citation omitted).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint . . . . [C]ourts may also consider matters of which they may take judicial notice." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [his or her] claim." *Collins v. Morgan Stanley Dean*

---

Fed. R. Civ. P. 12.

*Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Travelers Indem. Co. v. Forrest Cty.*, 164 F. Supp. 3d 899, 902 (S.D. Miss. 2016).

Crum assets that its motion to dismiss should be granted because allegations of the Brandon Lawsuit fail to implicate coverage. In support of its assertion, Crum states that : (1) the alleged "pollution condition" was not caused by an "occurrence"; (2) the coverage parts of the Policy do not cover damages caused by a known condition or by Gold Coast's intentional conduct; and (3) the "pollution condition" and the City's alleged "property damage" did not first begin during the Policy's effective policy period; (4) the City's alleged "property damage" is not a result of Gold Coast's "work".

### ii.   "Pollution Condition" Caused by an "Occurrence"

This court has already determined in Section III.a.i that the Policy does not require Crum to defend Gold Coast because the Brandon Complaint alleges actions that do not meet the Policy's definition of an "occurrence". This court need not reiterate such discussion here.  Accordingly, this court reasserts its conclusion above and finds that the "pollution condition" was not caused by an "occurrence"; therefore, Crum has no duty to defend Gold Coast in the Brandon Lawsuit.

### iii.   Intentional Conduct

Crum next argues that the Policy does not provide coverage for damages or pollution cleanup costs since the Brandon Complaint alleges charges that Gold Coast acted intentionally, willfully, and deliberately.

SECTION II – ADDITIONAL EXCLUSIONS

The following additional exclusions apply to the Third Party Pollution Liability Coverage Part in addition to those contained within the Common Provisions:

This Policy does not apply to "damages", "defense expenses", or any loss, cost or expense, or any "claim" or "suit":

* * *

4. Intentional Acts

Based upon or arising out of any "pollution conditions" that result, in whole or in part, from:

a. The intentional, willful or deliberate injury, by any insured or at the direction of any insured, to person or property; or

b. The non-compliance by any insured with any request, demand, order or statutory or regulatory requirement, administrative complaint, notice of violation, notice letter, executive order or instruction of any governmental or public agency or body.

5. Known Conditions

Based upon or arising out of "pollution conditions" that were known to be present, by any insured at any time before the beginning of this "policy period", or that were disclosed in the application for this insurance or any of the accompanying information provided to us.

[Docket no. 1-1, PP. 47].

Crum thus campaigns that the Brandon Lawsuit alleges disqualifying conduct only and, thus, all coverage is precluded by the terms of the Policy. According to Crum, because the Brandon lawsuit alleges that "Gold Coast consistently and surreptitiously discharged its high-temperature, corrosive waste into the City's sewer system for an unknown number of years leading up to 2014," the complaint necessarily alleges intentional conduct. Crum says further that the Brandon lawsuit alleges Gold Coast acted intentionally because it admitted to dumping for years and that it continued illegally to discharge its wastewater into Brandon's sewer system during the majority of 2016.

Gold Coast responds that the allegations of the Brandon lawsuit are ambiguous. According to Gold Coast, the Brandon lawsuit alleges that Gold Coast acted negligently and that its wastewater discharges occurred without allegations of exactly, or even hypothetically, how they occurred. Moreover, says Gold Coast, the Brandon lawsuit seeks to recover damages for a violation

15

of a municipal ordinance (City of Brandon, Mississippi Ordinance §82-108(c)[8]) that does not require that the defendant act intentionally.

This court is persuaded otherwise, as earlier noted; that the Brandon lawsuit unambiguously alleges that Gold Coast engaged in intentional and reckless conduct whatever labels Brandon attached to the conduct in the underlying lawsuit.

### iv.  Acts that First Occurred Before the Policy Period

Crum argues that the Policy does not cover any damages that began before the effective date of the Policy, or after the end of the policy period. The Brandon Lawsuit alleges that Gold Coast consistently and surreptitiously discharged corrosive waste into the Brandon sewer system – allegedly for years before 2014. Crum says that "any 'pollution condition' and resulting 'property damage' did not first occur during the Policy's effective 'policy period' between August 25, 2016, and August 25, 2017." Gold Coast responds that the Brandon Lawsuit is ambiguous, and the ultimate trier of fact could find that the damages occurred only during the covered period. This court again finds it instructive to quote the language of the policy here:

SECTION I – INSURING AGREEMENT

> 1. b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:
>
>> (1) Before the "policy period", no insured had knowledge of any "occurrence" or "pollution condition" that could reasonably give rise to a "claim" under this Policy;
>>
>> (2) Neither the "claim" against you for that "bodily injury", "property damage" or "pollution condition", nor the "occurrence" resulting in that "bodily injury", "property damage" or "pollution condition" were reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

---

[8] Sec. 82-108. - Penalties. […]
     (c) Any person violating any of the provisions of this article shall become liable to the city for any expense, loss or damage occasioned the city by reason of such violation.

(3) No fact, incident or circumstance involving an "occurrence" or "pollution condition" that reasonably would have resulted in a "claim" against you for that "bodily injury" or "property damage" or those "cleanup costs" was reported under any policy in effect before the "policy period" or disclosed in the application for this Policy;

(4) The "bodily injury", "property damage" or "cleanup costs" resulted from a "pollution condition" caused by an occurrence that took place within the "coverage territory";

(5) The "occurrence" arises out of "your work" performed during the "policy period", or "your product" delivered during the "policy period", except for "bodily injury" or "property damage" arising out of the "products-completed operations hazard" of "your product" or "your work";

(6) The "bodily injury", "property damage", or "pollution condition" resulting in "cleanup costs", first occurs during the "policy period"; and

(7) A "claim" for "damages" for that "bodily injury" or "property damage", or for "cleanup costs" for that "pollution condition" is made against any insured and reported to us in accordance with the provisions set forth in Section VI Common Conditions, 5. Duties In The Event Of A Claim Or Suit within the Common Provisions.

[Docket no. 1-1, PP. 42-42].

The Policy further provides direction about the presumptive beginning of continuous or progressive damage, saying that if the timing cannot be determined, then the damage began before the Policy's effective date and, therefore, is not a covered condition.

SECTION III – ADDITIONAL CONDITIONS […]

2. Continuous or Progressive Damage or Injury "Bodily injury", "property damage" or "cleanup costs" resulting from a "pollution condition" occurring or existing partly before and partly during the "policy period" will be deemed to have occurred or existed before the policy period.

If the date cannot be determined upon which such "bodily injury", "property damage" or "pollution condition" first occurred or existed then, for the purposes of policies issued by us, such "bodily injury", "property damage" or "pollution condition" will be deemed to have occurred or existed before the "policy period".

17

Gold Coast responds that this provision of the Policy seems contrary to the requirement of the law that ambiguities be resolved in favor of coverage.

This court is not persuaded. The terms of the Policy are express, and the underlying lawsuit clearly alleges that Gold Coast began its disposal of highly corrosive and high temperature waste in Brandon's sewer system sometime before the policy period. This court, accordingly, concurs with Crum on this point.

<u>v.   Claim Not Made During Policy Period</u>

Crum says that the Policy requires that any claim must be made during the policy period to afford coverage. Brandon filed its lawsuit in July, 2018, almost two (2) years after the Policy terminated. Gold Coast, contrariwise, says that the Policy requires that Gold Coast notify Crum of the possibility of a claim during the policy period, which would then allow any claims made against it outside of the policy period to relate back.

The Policy dictates the duties of the parties and states:


SECTION I – INSURING AGREEMENT

1. Third Party Pollution Liability

* * *

b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:

* * *

(8) A "claim" for "damages" for that "bodily injury" or "property damage", or for "cleanup costs" for that "pollution condition" is first made against any insured and reported to us in accordance with the provisions set forth in Section VI - Common Conditions, 5. Duties In The Event Of A Claim Or Suit within the Common Provisions, during the "policy period" or Extended Reporting Period, if applicable, that we provide under Section VIII – Extended reporting Periods.

The Policy further states:

SECTION VI – COMMON CONDITIONS

\* \* \*

6. Duties In The Event Of A Potential Claim

If: (1) during the "policy period" you first become aware of an "occurrence", offense, "wrongful act" or "pollution condition" that reasonably may result in a "claim" against you; and (2) such "occurrence", offense, "wrongful act" or "pollution condition" did not occur before the Retroactive Date, then you must provide written notice to us about that "occurrence", offense, "wrongful act" or "pollution condition" during the "policy period". If such notice is received by us during the "policy period", and this Policy has not been renewed upon expiration of the "policy period", then any "claim" made against you after the "policy period" resulting from that "occurrence", offense, "wrongful act" or "pollution condition" shall be deemed, for the purposes of the . . . Third Party Pollution Liability Coverage Part, to have been made on the date such written notice is received by us. This provision shall not apply to "occurrences", offenses, "wrongful acts", "pollution conditions" or potential "claims" of which you or any insured first became aware or reported during any Extended Reporting Period[9].

The parties agreed on the Policy with a Policy Period of August 25, 2016, through August 25, 2017. Shortly thereafter, in October, 2016, Brandon filed a complaint with MDEQ, which initiated two (2) subsequent investigations. Brandon began its own investigation contemporaneously with MDEQ's first investigation. Gold Coast provided notice of the potential claim to Crum in April 12, 2017. Crum then refused to renew the Policy because of the potential claim. Brandon filed the Brandon Lawsuit in July, 2018.

Crum argues that Gold Coast knew of its surreptitious dumping of highly corrosive and high temperature waste into the Brandon sewer system and, therefore, could not have first discovered the potential claim during the Policy Period. This court agrees. Accordingly, this court

---

[9] From the face of the Policy, while the Section VI, Paragraph 6, refers to an Extended Reporting Period, the Policy defines such an Extended Reporting period in Section VIII – EXTENDED REPORTING PERIODS FOUND ON PP. 39-40 of Docket no. 1-1.

finds that the Policy does not cover any damages that began before the effective date of the Policy, or after the end of the policy period.

> ### vi.   Occurrence Arising from Gold Coast's "Work"

Crum says that the Brandon lawsuit does not allege any actions which would fall under the policy's definition of covered "work". The Policy defines Gold Coast's covered "work" as follows:

SECTION I – INSURING AGREEMENT

1. Contractors Pollution Liability

* * *

b. This insurance applies to "bodily injury", "property damage" and "cleanup costs" only if all of the following conditions are met:

* * *

(5) The "occurrence" arises out of "your work" performed during the "policy period", or "your product" delivered during the "policy period", except for "bodily injury" or "property damage" arising out of the "products-completed operations hazard" of "your product" or "your work";

The Policy's Designated Operations Coverage – CPL Endorsement defines Gold Coast's "work" as follows:

DESIGNATED OPERATIONS COVERAGE – CPL

This endorsement modifies insurance provided under the following:

CONTRACTORS POLLUTION LIABILITY COVERAGE PART

SCHEDULE

Designated Operations:

> Collection and transport of restaurant grease and cooking oils.

Under the Common Provisions, SECTION VII – COMMON DEFINITIONS,

item 39. "your work" is deleted in its entirety and replaced by the following:

> 39. "Your work":

a. Means:

(1) Only those operations indicated in the Schedule shown above; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.

This insurance applies only to "bodily injury" or "property damage" arising out of the "designated operations" indicated in the Schedule shown above.

Gold Coast asserts that the Brandon Lawsuit clearly alleges that Gold Coast collected and transported cooking oils and restaurant grease, its "designated operations". Further, says Gold Coast, the allegations of the Brandon Lawsuit are vague about how the alleged waste entered the sewer system. According to Gold Coast, the alleged waste could have entered the sewer system many ways in the scope of Gold Coast's work, including: improperly connecting disposal/transfer hoses; utilization of improperly sealed containment vessels; or various other reasons.

This court is persuaded that the allegations of the Brandon Lawsuit are clear that Gold Coast allegedly illicitly disposed of highly corrosive and high temperature wastes in the Brandon sewer system. Brandon does not allege that Gold Coast accidentally spilled the waste during the transport or collection of cooking grease and oils. Rather, the Brandon Complaint alleges that Gold Coast intentionally disposed of its waste in violation of several statutes and ordinances. Accordingly, this court must grant Crum's motion to dismiss based upon this ground.

vii.   Duty to Defend

A "duty to defend under Mississippi law arises if the suit in question 'respects the insurance afforded by the terms of the policy .' " *Merchants Company v. American Motorists Insurance Company,* 794 F.Supp. 611, 616 (S.D.Miss.1992), quoting *Mavar Shrimp and Oyster Company v. United States Fidelity & Guaranty Company,* 187 So.2d 871 (Miss.1966). This means that, "if the suit is within the coverage afforded by the policy, then the insurer has a duty to defend its insured. The fact that a duty to defend arises when the suit is within the coverage is self-evident." *Id.,* at 617. This court has already addressed the parties' arguments regarding coverage in Section III.a.i *supra*. This court reiterates its ruling above that Gold Coast's suit is not within the Policy. This court, accordingly, finds that Crum has no duty to defend Gold Coast in the Brandon Lawsuit.

viii.   Dishonest Acts

Crum next argues that the Policy contains an exclusion for "Criminal, Fraudulent or Dishonest Acts" which precludes coverage under the Brandon Lawsuit. Again, this court quotes the Policy:

SECTION V – COMMON EXCLUSIONS

The following exclusions apply to all Coverage Parts attached to this Policy except where specifically noted:

This Policy does not apply to "damages", "defense experts", "cleanup costs", or any loss, cost or expense, or any "claim" or "suit": […]

3. Criminal, Fraudulent or Dishonest Acts

Based upon or arising out of:

a. Any criminal, fraudulent, or dishonest act, omission or offense committed by the insured. […]

b. Any act, omission or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage […]

22

Gold Coast responds that this court must interpret the Policy in favor of the insured and coverage.

This court finds that the Policy excludes coverage for criminal, fraudulent or dishonest acts. As discussed *supra*, the Brandon Lawsuit clearly alleges causes of action that might constitute criminal or dishonest acts in violation of multiple statutes and regulations, such that the Policy would not afford coverage. Brandon further alleges that Gold Coast did so intentionally and "surreptitiously".

Mississippi law mandates that "[a] policy must be considered as a whole, with all relevant clauses together." *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.,* 499 F. Supp. 3d 288, 294 (S.D. Miss. 2020) (citing *United States Fid. & Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008)(internal citation omitted).  The policy exclusions and exceptions thereto can be (and often are) valuable in determining the parameters of coverage, generally, and the meaning of "accident" within the definition of "occurrence," specifically. *Architex Ass'n, Inc.* 27 So. 3d at 1160.

While the referenced exclusion may be applicable to Brandon's claims, it is unnecessary to address the exclusion as this court has already found that that the Policy' coverage provisions do not extend to the claims asserted by Brandon in the underlying state court action. *See Doe v. Peoples,* 394 F. Supp. 3d 655, 666 (S.D. Miss. 2019) (finding that while one or more of the referenced exclusions were clearly applicable to the [plaintiff's] claims, it was unnecessary to address the exclusions as it was apparent that the policies' coverage provisions did not extend to the claims asserted…in the underlying actions.).

ix.   Punitive or Multiplied Damages

Crum further argues that the Policy's Punitive or Multiplied Damages Exclusion precludes any coverage under the Brandon Lawsuit for punitive damages. As previously discussed, this is another "exception" provided in the Policy. The relevant section provides:

14. Punitive or Multiplied Damages

For punitive damages or multiplied portion of treble or other multiplied damages, or that arise out of that portion of any "claim" or "suit" seeking or awarding punitive damages or the multiplied portion of treble or other multiplied damages.

Gold Coast, misunderstanding Crum's argument, alleges that it had properly alleged a claim for punitive damages against Crum for Crum's supposed bad-faith denial of coverage.

This court, again, need not address this issue for the reasons stated *supra*.

x.   Indemnification

Crum asks this court to dismiss Gold Coast's claim for indemnity. This claim is not yet ripe. Gold Coast does not challenge such. Gold Coast, instead, asks this court to hold any ruling on indemnification in abeyance until it is ripe, stating that this court should "allow this case to move forward and, at the appropriate time, substantive motions can be filed as to any remaining claim regarding Crum['s]…duty to indemnify." [Docket no. 23, p. 14].

This court acknowledges that,

[w]hile the duty to defend can be determined at the beginning of a lawsuit, "an insurer's duty to indemnify generally cannot be ascertained until the completion of litigation, when liability is established, if at all." *Ass'n Cas. Ins. Co. v. Major Mart*, Inc., No. 1:12CV022-SA-DAS, 2013 WL 3409217, at *5 (N.D. Miss. July 8, 2013) (citing *Estate of Bradley ex rel. Sample v. Royal Surplus Lines Ins. Co.*, 647 F.3d 524, 531 (5th Cir. 2011); *see St. Paul Fire & Marine Ins. Co. v. Renegade Super Grafix*, Inc., 209 F. Supp. 3d 895, 897, n.1 (S.D. Miss. 2016).

This court, however, notes that "if an insurer has no duty to defend a specific lawsuit, it likewise bears no duty to indemnify the insured against any resulting adverse judgment." *See Western Heritage Ins. Co. v. River Entertainment,* 998 F.2d 311, 315 (5th Cir.1993). The Court

24

in *Western Heritage* stated that "logic and common sense dictate that, if the district court's reading of [a policy's] exclusion is correct (*i.e.* no duty to defend), there can be no indemnity for any judgment.. following a decision in the [policyholder's] state court suit." *Id*.

This court has already found that Crum has no duty to defend Gold Coast in the underlying Brandon Lawsuit because the Brandon's allegations take Gold Coast out of the realm of coverage under the Policy; accordingly, this court grants, as it must, Crum's motion to dismiss *in toto*.

## IV.   CONCLUSION

IT IS, THEREFORE, ORDERED that Gold Coast's Motion for Partial Judgment on the Pleadings [Docket no. 16] hereby is DENIED.

IT IS FURTHER ORDERED that Crum's Motion to Dismiss [Docket no. 18] hereby is GRANTED.

IT IS FINALLY ORDERED that Gold Coast's Complaint [Docket no. 1] hereby is DISMISSED without PREJUDICE.

SO ORDERED this the 30th day of March, 2022.


/s/HENRY T. WINGATE
UNITED STATES DISTRICT COURT JUDGE